UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>v.<br><br>HUMBERTO IRIBE,<br><br>                         Defendant. | Case No.:  00cr1242 JM<br><br>**ORDER ON MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. 3582(c)(1)(A)(i)** |

Pending before the Court is Defendant Humberto Iribe's Motion to Reduce Sentence Pursuant to 18 U.S.C. 3582(c)(1)(A)(i). (Doc. No. 777.)  Upon careful review of the motion and after considering the applicable factors provided, IT IS HEREBY ORDERED that the motion is **denied**.

## BACKGROUND

On September 21, 2018, Mr. Iribe pled guilty to conspiracy and attempted kidnapping and was concurrently sentenced to a total of 300 months imprisonment and 3 years of supervised release.  (*See* Doc. No. 729.)  Mr. Iribe is projected to be released on supervised release on December 8, 2022.  (Doc. No. 765 at 34.[1])

---

[1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

On November 12, 2020, the Clerk of Court filed Mr. Iribe's *pro se* Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A)(i). After the United States served its Response in Opposition, (Doc. No. 765) the court reappointed Mr. Carlos to act as Mr. Iribe's counsel and set a new briefing schedule, (Doc. Nos. 772, 773.) Counsel filed the instant Motion to Reduce Sentence Pursuant to First Step Act, 18 U.S.C. §3582(c)(1)(a)(i) on January 4, 2021 citing ongoing health concerns caused by the outbreak of COVID-19 as grounds for Mr. Iribe's early release. (Doc. No. 777.)[2] The United States filed its opposition on January 10, 2021 (Doc. No. 778) and Defendant filed a reply (Doc. No. 784).

## LEGAL STANDARD

Generally, a court may not correct or modify a prison sentence once it has been imposed, unless expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure. *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003). Mr. Iribe seeks modification of his sentence under the compassionate release provision of 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).

The First Step Act allows prisoners to bring their own motions for compassionate release after: (1) fully exhausting administrative appeals of the Federal Bureau of Prisons' ("BOP") decision not to file a motion, or (2) "the lapse of 30 days from the receipt ... of such a request" by the warden of the defendant's facility, "whichever is earlier." 18 U.S.C. § 3852(c)(1)(A)(i). Thereafter, upon considering the applicable factors set forth in section 3553(a), the court may determine whether "extraordinary and compelling reasons warrant such a reduction" and "that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

---

[2] Accordingly, Mr. Iribe's *pro se* Emergency Motion for Compassionate Release from Custody (Doc. No. 765) is **DENIED** as **MOOT**.

The relevant Sentencing Commission policy statement sets forth several "extraordinary and compelling reasons." U.S. Sentencing Guidelines, § 1B1.13 states:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. §3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after consideration of the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that —
> (1)(A) Extraordinary and compelling reasons warrant the reduction . . .
> (2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
> (3) The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to § 1B1.13 lists four circumstances that qualify as "extraordinary and compelling reasons": (A) medical condition of the defendant; (B) age of the defendant; (C) family circumstances; and (D) "Other reasons—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 n.1.

## DISCUSSION

On October 4, 2020, Mr. Iribe emailed the warden of F.C.I. Edgefield a "Compassionate Release request pursuant to the Coronavirus Aid Relief Economic Security ("CARES") Act."[3] (Doc. No. 777-1.) Mr. Iribe stated that he had completed 19 and half years of his 25-year sentence, and had been diagnosed with hyperthyroidism,

---

[3] The Coronavirus Aid, Relief, and Economic Security (CARES) Act was enacted on March 27, 2020. Section 12003(b)(2) of the Act provides, "during the covered emergency period[,] if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of Title 18, United States Code, as the Director determines appropriate."

Graves' disease, an autoimmune disease that puts him at greater risk of contagion and death. (*Id.*)

On October 6, 2020, Mr. Iribe received the following email response:

> Your written correspondence addressed to the Warden, via email, has been received.
>
> After reviewing your concern(s), this matter has been forwarded to the Compassionate Release Coordinator/RIS for review. You may refer to Program Statement 5050.50, Compassionate Release Request/Reduction in Sentence, for guidance.

*Id.* at 10.

On October 20, 2020, Mr. Iribe signed his emergency motion for compassionate release and signed a supplemental affidavit on November 5, 2020. (*See id.* at 5, 9.) Mr. Iribe mailed his *pro se* motion to the district court where it was docketed, with the court ordering that the motion be filed *nunc pro tunc* to the date it was received, November 9, 2020. (Doc. No. 765)

Mr. Iribe now moves this court to find COVID-19 is an extraordinary and compelling reason to merit his compassionate release from confinement. (Doc. No. 777.) Mr. Iribe, who is 45 years old, argues that he suffers from an autoimmune disorder called Graves' disease which is caused by a malfunction in the body's disease fighting immune system. (*Id.* at 9.) Mr. Iribe maintains that a major symptom of Graves' disease is hyperthyroidism, which plays a major role in metabolism, growth, and development. (*Id.*) Mr. Iribe argues that, generally, individuals with hyperthyroidism may be at a higher risk of complications from infections, such as COVID-19. Further, Mr. Iribe contends that along with Graves' disease and hyperthyroidism, two additional health conditions, atrial fibrillation, and an inguinal hernia, put him at greater risk of contagion and death from COVID-19. (*Id.* 10.) Mr. Iribe asserts, and the Government does not dispute, *(see* Doc. No. 777 n. 7), that he has satisfied 18 U.S.C. § 3582(c)(1)(A)(i)'s administrative exhaustion requirement because he filed his motion after 30 days had lapsed from the time he presented his request to the warden.

The Government opposes Mr. Iribe's request, principally arguing that he does not have a serious physical or mental condition within the meaning of the Sentencing Commission's policy statement because Mr. Iribe's conditions are well managed and do not rise to the level of seriousness as to substantially diminish his ability to provide self-care. (*Id*. at 11-21.) Secondarily, the Government contends that Mr. Iribe's conditions are not risk factors according to the Center for Disease Control ("CDC"). (*Id*. at 20-23.) Finally, the Government contends that the risk Mr. Iribe poses to the community and the relevant 18 U.S.C. § 3553(a) factors weigh against his release. (*Id*. at 23-25.)

Having satisfied the administrative exhaustion requirement, Mr. Iribe's motion hinges on whether the risks presented by the current COVID-19 pandemic, along with the health conditions of Graves' disease - hyperthyroidism, atrial fibrillation, and an inguinal hernia constitute "extraordinary and compelling reasons" for modification of his sentence. *See, e.g., United States v. Cosby*, Case No. 18cr4474-JAH, 2020 WL 3830567, at *4. (S.D. Cal. July 7, 2020).

**a) Extraordinary and Compelling Reasons**

Mr. Iribe has not persuaded the court that his medical conditions qualify as "extraordinary and compelling" reasons for release within the context of 18 U.S.C. § 3582 (c)(1)(A) and U.S.S.G. § 1B1.13. First, the court is not satisfied that Mr. Iribe is at heightened risk of serious illness due to any of the conditions he advances for his requested relief. The CDC maintains a list of underlying medical conditions that may increase a person's risk of severe illness from COVID-19. Revisions were made on December 23, 2020 to reflect recent data supporting increased risk of severe illness from the virus that causes COVID-19 among persons with Down syndrome, and to reflect an increased risk of severe illness in children who have sickle cell disease and chronic kidney disease. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Neither Mr. Iribe's Graves' disease nor his hyperthyroidism appear as a condition that might increase the risk of severe illness from the virus that causes COVID-19 under the category Immunocompromised

State (Weakened Immune System) from Blood or Bone Marrow Transplant, Immune Deficiencies, HIV, use of Corticosteroids, or use of other Immune Weakening Medicines. The immune deficient people this category appears to be referring to are those with primary immunodeficiency (PI).[4]  No evidence has been provided that Mr. Iribe is taking any medications that would fall into the "immune weakening" variety.  The category does, however, include the catchall language "having a weakened immune system might increase your risk of severe illness from COVID-19."[5]   Mr.  Iribe's citation to one medical journal article published in July 2020 provides: "[b]ased on a contrite meta-analysis of available data, thyroid disease seems to be associated with an enhanced risk of severe COVID-19 infection….  First thyroid hormones were important in the regulation of innate immune response.  Therefore, excess or deficiency of thyroid hormones levels observed in thyroid disease will lead to dysregulation of innate immune response, " (Doc. No. 784 at 3 quoting NCBI article, *Thyroid disease is associated with severe coronavirus disease 2019 (COVID -19) infection*, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7387272/#bib9(Jul.2020)).  This article does not persuade the court that hyperthyroidism, controlled medically, warrants the relief requested.

     Similarly, Mr. Iribe's heart condition, atrial fibrillation, is not directly listed under the Heart Conditions and Other Cardiovascular and Cerebrovascular Diseases category (listing heart failure, coronary artery disease cardiomyopathies, pulmonary hypertension, and hypertension or stroke).  A generous read of the guidelines may, however, place atrial fibrillation within this category because the condition could increase Mr. Iribe's risk of stroke because irregular heartbeat (including atrial fibrillation) can cause blood clots that

---

[4] https://www.cdc.gov/genomics/disease/primary_immunodeficiency.htm
[5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#immunocompromised-state

may break loose and cause a stroke[6]. However, noted in the medical records is a suggestion that Mr. Iribe regains sinus rhythm of the heart following an episode of fibrillation. (Doc. No. 771 at 9; *see also* Doc. No. 781.) It appears that atrial fibrillation is being medically managed while Mr. Iribe is in custody. An inguinal hernia does not appear on any of the categories of conditions that places individuals at increased risk for severe illness from COVID-19. Thus, while Mr. Iribe suffers from three or four conditions (if the hyperthyroidism is separated from the Graves' disease condition), only one of them, atrial fibrillation, potentially places him in a class of adults who "might be at an increased risk for severe illness from the virus that causes COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

Because Mr. Iribe has alleged a health condition that could, potentially, put him at heightened or increased risk for severe illness from COVID 19, the court turns to the allegations surrounding conditions at F.C.I. Edgefield, the prison where Mr. Iribe is currently housed. To support his position, Mr. Iribe has included a copy of a BOP press release regarding an Inmate Death at F.C.I. Edgefield. (*See* Doc. No. 777-1 at 17.) Further, he cites to the high infection rate at F.C.I. Edgefield, which the government does not dispute. The BOP website currently shows that there are 25 confirmed active inmate COVID-19 cases, 23 active staff COVID-19 cases, 1 inmate COVID-19 death, 197 inmate recovered COVID-19 cases, and 10 staff recovered COVID-19 cases. *See* https://www.bop.gov/coronavirus/ (last visited January 25, 2021). But Mr. Iribe's position overlooks the fact that the BOP has implemented various preventive and mitigating measures to protect inmates and staff at its facilities. (See Doc. No. 778 at 3-6.) More importantly, his conclusions fail to take into consideration the existence and increasing availability of COVID-19 vaccines.

---

[6] https://www.cdc.gov/stroke/conditions.htm

### b) COVID-19 vaccine availability

The government has based a significant part of its opposition to the motion to the BOP's response to the pandemic, including the prospect of federal inmates being vaccinated against COVID-19 in the foreseeable future, citing general vaccination numbers for inmate populations. (Doc. No. 778 at 2-6.) There is no denying the vaccine shortages and slow pace of inoculations thus far, and the uncertainty as to when and for whom vaccinations will be available. In the meantime, to combat anxiety in the face of this worldwide health emergency, the BOP has formulated a contingency plan which includes securing inmates in their "group gatherings," enhanced screening of staff at all BOP locations, and heightened intake measures for newly admitted inmates. (*Id.* at 3-5.) The government has commenced widespread asymptomatic testing as well as transferring many inmates to home confinement. (*Id.* at 6.) In sum, the court cannot simply ignore the measures taken by the BOP to mitigate the risks of COVID-19 transmission in the BOP population.

Under the present conditions at F.C.I. Edgefield, Mr. Iribe has, therefore, not demonstrated how his pre-existing conditions diminish his ability to provide self-care such that they would amount to "extraordinary and compelling" reasons for release under § 3582 (c)(1)(A)(i).

### c) Section 3553(a) Factors

The court finds a sentence reduction is inconsistent with the applicable policy statements issued by the Sentencing Commission. *See* 18 U.S.C. § 3553(a). The introductory portion of this section instructs courts to "impose a sentence sufficient, but not greater than necessary" to punish, deter, protect the public, and rehabilitate the defendant.

#### i.  Seriousness of the Offenses of Conviction

The generic offenses of conviction, conspiracy, and attempted kidnapping, to which Iribe pled guilty after trial had already commenced against his co-defendant, Kimberly Bailey, do not capture the horror of Mr. Iribe's crimes and the extent of his involvement.

Essentially, Mr. Iribe and his two codefendants hatched a plan in San Diego to lure a victim, Richard Post, to Tijuana, Mexico, where he was to be beaten and tortured until he revealed the location of money. After the kidnapping of Post Iribe directed others to inflict punishment until, ultimately, Post was murdered. (Doc. 717, at 4-5.)[7]

The seriousness of Mr. Iribe's crimes, therefore, do not support the granting of his current motion, nor do relevant sentencing purposes such as general and specific deterrence and protection of the public, notwithstanding Mr. Iribe will be deported to Mexico following the completion of his custodial sentence.

On the positive side of Mr. Iribe's ledger there are a few equities. Mr. Iribe's less than exemplary prison record must be read in context. Although he has been "written up" a total of eight times, it has been over the course of nineteen years of incarceration. Moreover, he has pursued educational opportunities and tutored other inmates.

Considering relevant circumstances, the factors supporting a denial of Mr. Iribe's motion outweigh the factors supporting a grant of his motion. Accordingly, the court declines to reduce its original sentence to time served.

## CONCLUSION

For the reasons set forth above, Mr. Iribe's Motion to Reduce Sentence Pursuant to First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), is **DENIED**. Should Defendant develop a documented case of uncontrollable cardiac fibrillation or other qualifying condition that would better support a renewed motion for compassionate release, the court will entertain such a motion.

IT IS SO ORDERED.

Dated: February 2, 2021

Hon. Jeffrey T. Miller
United States District Judge

---

[7] At the sentencing hearing of Kimberly Bailey, the court found that Richard Post, whose body was never recovered, was murdered.